for, among other reasons, ignoring key cooperating evidence. Yet the agency has made the same mistake again. On remand, there was only one question the agency had to answer. Does the cooperating evidence in the record sufficiently demonstrate that Francisco was persecuted in the past and is therefore presumed likely to be persecuted against in the future? Can you just clarify, I understand he was in fact removed to El Salvador. Are you in any kind of contact with him? Do we know he's still okay? Your Honor, I am in limited contact with him. I have submitted the briefing to him to look at beforehand, so I know he is alive. He tells me he is hiding, much in the same way that the record supports that he was hiding before he came here. And I think the record as it stands demonstrates that he was persecuted in the past. So to the one question I was discussing, I think the only thing you have to look at is past persecution. And in finding otherwise, the agency made several mistakes and used an impermissible standard of review. Can you tell me whether there is a present issue of fact as to whether he is still a member of the gang? Your Honor, there is not an issue with that. This Court's first decision rejected the immigration judge's analysis, which was adopted by the BAA. I'll refer to them throughout today as the agency. It rejected the agency's analysis that he was a current as opposed to a former gang member. The Court found there was a little more that Francisco could have done to distance himself from the gang. The issues... Forgive me, Mr. Block. And there's a slight delay, so I'm sorry about that. I'll try to slow down. You agree that we could order a remand and the IJ could clean up all of the various mistakes and oversights that you've cited for us. And Mr. Arizabal could still lose on questions of credibility. But I take it your central point is that both the IJ and the Board have to accurately recount Mr. Arizabal's evidence and give the evidence its due. Yes, Your Honor. That is the central point, that the agency failed to view the evidence cumulatively, and that includes mistakes such as ignoring Anna's 2016 letter, a letter that is at least as important as the two letters that the agency missed the first time that caused this Court to remand the decision. Moreover, the agency made several mistakes that could be corrected on Our position is that remand is the minimal relief that Francisco is entitled to based on the record. Francisco also believes that the record can cause you guys to go further and actually demonstrate that he was persecuted in the past. I have a sort of an odd question, I suppose, and you might not know the answer. One thing that the IJ noted was that he hadn't had his tattoos removed, which is a horrendous process, painful, miserable process. But do you have any idea how the... Judge Bauer wanted to know whether you were speaking from experience. He finally knows my secrets. After all these years. How did you get to see those? How extensive are they? Are you aware of how extensive they might be? Yes, Your Honor. He has highly visible tattoos on his feet, on his legs, on his arms, in his neck and his body. The tattoos are essentially everywhere but his face. And that, I think, speaks to the question of, is it plausible that he is being persecuted because of these tattoos? That's sort of the nexus part of the withholding of removal test. And since his tattoos are so visible, the government does not contend that the persecution is happening for some other reason than his tattoos and potential affiliation with the gang, which isn't obvious when looking at the tattoo. So the question then, I guess, is really focused on the corroborating evidence. Because if you find that the corroborating evidence is valid, the stories that it supports, I think, clearly demonstrate past persecution. And then your question, Your Honor, sort of goes to, is there a nexus between the past persecution and his protected class? The protected class question is answered by this court's first opinion in Arrazabal and by Benitos Ramos. Tattooed former Salvadorian gang members are a recognized particular social group. So to Judge Wood's first question, that issue has sort of already been put aside. And as has the issue of, is there a nexus between the harm and the particular social group? The only question then is, are we going to credit the corroborating evidence in the record? And for a variety of reasons, Francisco believes that the record compels the conclusion that the stories that are corroborated are true. When you first heard Francisco's case, there was only four individuals who had submitted evidence in the record. Francisco's mother, Francisco's sister, Francisco's former mother-in-law, and Francisco's uncle. On remand, he bolstered the evidence with submission from six different individuals. Three of these individuals submitted sworn affidavits, and three of these individuals submitted letters. None of these people were related parties. In addition, the mother and the sister testified in front of the agency and submitted new letters. And these new letters were the letters that were completely ignored. The record also contains a bounty of newspaper articles and country reports that explain the context that Francisco finds himself in El Salvador, that makes the idea that someone is being targeted for their tattoos eminently plausible. Well, his point, as I recall, is that he is at risk from MS-13 because he's not rejoining, but he's also at risk from the police because of the tattoos, the Monodura program, or whatever you want to call it, is in place. Correct, Your Honor. Francisco has demonstrated there's a three-pronged risk he faces. He faces a risk from MS-13 for his refusal to rejoin, and his tattoos just make him more visible to the gang. He also faces a risk from the government who is, as you which has its pluses, but they're all minuses for Francisco. As the Seventh Circuit, or sorry, as the Ninth Circuit found in Alvarez, and it's a point of common sense, it is very hard for the government to distinguish between a current and former gang members based on their outward appearance through tattoos. So that part of his story has additional corroborating evidence there that other courts have recognized. And the third risk he faces is from other gangs who, like the former gang member. And this kind of testimony doesn't come just from Francisco. It comes from all the different people who corroborated his testimony. Now the government complains that some of the letters appear to be mass-produced, I guess is how I'll put it. They're very similar. They're not identical, actually. I've looked at them, but they're similar. They are similar, and I will add they're sworn affidavits, and I think that's an important point. Because what they're swearing to are both, on one hand, general details. So three people have sworn under oath that Francisco is being targeted by the gang, that he's being targeted by the police, that he's been beaten. They're swearing to these general things as being true. So I think the only way to look at three similar affidavits like those is to find that they bolster his a specific story about how Francisco was pistol whipped by gang members, and the witness, Dinora, was there to see it and care for him when his face was bloodied. And in fact, she wrote how she wanted to take him to the hospital, but feared that they'd be intercepted by the gangs on the way there. So on one hand, they're similar in their generalities, which I think bolsters Francisco's The agency essentially notes and otherwise ignores, and this is the fundamental mistake that the agency makes throughout its opinion. They look at a piece of evidence, they find one reason that is imperfect. It's not a reason that requires you to dismiss the evidence, and then they brush the evidence completely aside and move on to the next piece of evidence, forgetting that that prior piece of evidence existed at all. So when the court finds that a specific piece of evidence lacks a specific detail, they're asking the wrong question. The question is, does the record as a whole support that Francisco was likely to be persecuted again in the future because he was persecuted in the past? And you ask, are there specific details? And there certainly are, such as this sworn affidavit that talks about when he was pistol whipped in the face. Dinora Franco. Correct. So the government also derives from the exchange from his mother with the immigration judge the proposition that even though he's badly treated in El Salvador and can expect to be, that everybody else is too, that he's really just in the same boat. So your honor, I think this is the one of the prime examples of the agency's reading that demonstrates it failed to view the evidence cumulatively. Quite simply, Ana testified to the contrary, not only in her testimony before the agency, but in the letter that the agency ignored and her prior letter. In all of these letters. She's testifying through an interpreter, right? Correct. And she specifically said multiple times in that testimony before the interpreter that they were targeting, the gang was targeting him because he refused to rejoin. She also says that in the letter, both of her letters, it's implausible to state a conclusion that Francisco's mother believes he's being targeted just like every single piece of corroborating evidence in the record clearly identifies a persecutory motive. I think the other example where the court found a lack of persecutory motive that runs contrary to the evidence as the whole is when they said a rock thrown through Francisco's window wrapped in paper that spelled out a death threat in newspaper letters saying pay or we will kill you signed MS-13 doesn't show a persecutory motive. That's not supported from the record as a whole. Again, there are both specific stories and general testimony that Francisco was being targeted because he refused to rejoin the gang. That rock thrown through his window, standing alone, perhaps doesn't show a persecutory motive, but that's not the question the agency faced. They caught your attention. In fact, you're in your rebuttal time. Oh, thank you, Your Honor. With that, I would like to reserve my remaining three minutes for rebuttal. You may. Thank you. Mr. Stanton? May it please the court, Judge Welbner? This is not an uncommon scenario in immigration cases and I assume other areas of law. A litigant loses below, before the agency, before the court. Sometimes he's pro se. Sometimes he's represented by counsel. Wants a secret review from the Court of Appeals. Gets new counsel. Sometimes they're a good counsel. And new counsel sees issues that he thinks have merit and presents those arguments to the Court of Appeals, but those arguments were not raised to the agency below. Counsel suggests that it was a semblance of an argument, but it really wasn't. I understand that the petitioner here was pro se, but this court said in Chavarria v. Lynch, the decision was decided about six months after this panel's first opinion of the case, and Judge Bauer, I believe you were on, a member of that panel. The INAH requires exhaustion, even if the petitioner is pro se before the agency. It doesn't matter if he received new counsel in the Court of Appeals. And taking the court's analysis a step further, it also shouldn't matter if the court actually appoints counsel to represent the petitioner in the Court of Appeals. Well, let me just say, I mean, obviously is a generic sense what you say is true, but I don't see that problem here. I mean, this court had an earlier opinion. We indicated what the agency had to do. It went back. Evidence came in under the scope of that. The board analyzed that evidence. The board does not seem to have been at all worried about the scope of the remand. The board, first the IJ, and then the board came to their conclusion. So I don't think we have an exhaustion problem here at all. Well, the board, which was a three-member panel, the board specifically said in its opinion the petitioner did not challenge the immigration justice findings in fact. But that's, I don't think that's quite the full story, though. The board then goes into the facts of this case. The board is well aware that, you know, I'm looking at the discussion of the remand testimony. Does it corroborate? They discuss the letters, the letter from the uncle, the mother. And the mother The board didn't make the argument that you're making. I think the board was satisfied that there was exhaustion, and I certainly wouldn't second-guess it on that. Right. Well, I mean, the board didn't make the exhaustion argument because he never presented it, though. I mean, this is the first time we're seeing these arguments here in the court of appeals. Well, if you're raising exhaustion for the first time, it's the board's authority that we protect through the exhaustion requirement. And the board seemed to think this was within the scope of the remand. All right. Judge Roper, did you? I think Judge Roper. Judge Roper, hello, yes. The board overlooked various corroborating aspects of the evidence that was submitted at the second hearing. And the IJ failed to recognize a number of respects in which the I mean, for example, Anna Sylvia's original letter to the court corroborated his testimony that he was forced to pay $7,500 in bribes to get out of jail. Her letter represented that she sent Arizabella or his lawyer the money. That was a fact within her personal knowledge. It's an account as to the dates. As the IJ mistakenly believed, that was a significant error. And it did not equate the dangers that he faces with the general citizenry of Ecuador. And the, you know, the IJ discounted much of her testimony as derived from hearsay. But it's true that she had a lot of what she could tell came from him and from others. But the IJ just discounted the corroboration. Much of it found in the letters, the affidavits, the testimony, Arizabella. You know, he calls it interested parties. But who else is, for the most part, going to be sending these letters? It's someone's friends and relatives who know the most of what a Petitioner has experienced. You know, maybe they're not credible, but to summarily disregard testimony because someone is interested, that isn't appropriate. And, you know, Dinora, we have Dinora's testimony. She's not, you know, an interested family member. I think it's very sloppy work by both. I mean, I'm sorry. Please, please finish, Jess. I'm sorry. I went on too long. I have a number of responses to that. Number one, Ms. Franco-Dinora, she is indeed a family member. So the Appointed Counselor got that wrong on page 161 of the Joint Appendix. But the agency often encourages things, in fact, criticizes people for not getting letters from family members. So I think it goes to the weight at the most, not to whether the IJ should have factored it in. It's the absence of discussion that's very troubling. All right. Okay. Well, again, Ms. Franco is the sister-in-law of, yeah, so anyway, so she is part of the family. Petitioner's son is her nephew. So there's that. With respect to the dates of- But the IJ never said that. The IJ said, I'm going to disregard all testimony. He did say they were interested witnesses, though, which is correct. Which might make them better, not worse. Anyway, with respect to the dates, I mean, at best, that was a typographical error. I mean, she was clearly referring to his first arrest, which occurred two years prior. She testified that he was attacked in prison. That happened in 2008 during the first arrest. And she also got the dates of his release wrong. She testified that he was only in custody for short periods of time. His own interview with the asylum officer, which is on page 1145-46 of the administrative record, he told the asylum officer he was incarcerated for as much as nine years. That troubled me a lot, because we don't have an evaluation of that. We don't know what the IJ thought of it. And I thought you seemed to concede that it was an error, and you're trying to convince us it was harmless. Even if we do assume that the immigration judge, that she overlooked the letter, the letter doesn't solve the problem, like the fact that Anna also got the dates and the periods of incarceration wrong. So there's also that part of- But it's only part of the picture. I mean, to overlook something as significant as the time to get him out of jail. You're doing this weighing, but isn't it the IJ who should do it? Well, I suppose so. The IJ is supposed to be the finder of fact. Not counsel on a petition for review. Well, okay. All right. Yes. I mean, don't say that. Yes, I'll definitely concede that, Your Honor. But again, at best, the bribes only show that he was, in fact, in prison for some reason. I mean, his original adverse credibility finding was based on the fact that he claimed that the police here framed him. And he got railroaded by the public defender. So he was in prison, and for some reason, and his mother paid some bribes to get him released. That, I mean, to the extent the And so- But don't you build things up one step at a time? He had to show that he was in prison. He has good evidence that he was in prison, and he doesn't get out until his mother pays that bribe. That's not the end of the case, but isn't it an important building block? It would be a building block, but there's also several other issues of his claim that just are not sufficient to other holes, I mean, I suppose. But the idea- I mean, there's hearsay. I mean, the mother knows- But you can use hearsay in immigration proceedings. Yeah, the mother doesn't know why he was arrested, though. Right, but let's just get straight. There's no prohibition in immigration proceedings against hearsay. Not, there's no prohibition, sure, but it's also within the prerogative of the agency to give hearsay lest wait, as opposed to firsthand eyewitness account. But they don't explain, and they also distort Ana Silvia's testimony. She winds up, she's trying to, after this cross-examination with Ms. Galassi, she's trying to say they pressure. In his case, he did not want to join the gang, and that is why, you know, he was paying the rent. But then I became ill, and he was not able to pay the rent anymore. So after this big back and forth about, oh, don't other people get extorted in El Salvador, and the mother's saying, well, yeah, you know, they probably do. But in his case, it's that he wasn't joining the gang. It appears he wasn't joining the gang, and as far as the rent is concerned, usually greed is the reason why gangs commit extortion. It's not revenge. But in his case, they're punishing him for not rejoining the gang. I think if they were going to punish him for not rejoining the gang, they would have like physically attacked him rather than requiring rent. And throwing the stone, we're going to kill you, isn't enough? Well, to pay the rent, sure. But if you say pay or join, that's not what it said. Pay the rent or we'll kill you doesn't say what the motivation is here for. I mean, if it said pay or join, join or pay, I would concede that would be corroborating evidence that they're persecuting him because he's a former gang member who won't join. But all it says is pay. I mean, everyone, many people in El Salvador are being extorted by the gangs. Petitioner's statement itself also said on... So is the reason for the extortion irrelevant in your opinion? The reason extortion irrelevant in your opinion? Well, that goes to Nexus. That goes to Nexus. We haven't gotten that far yet. But he identified a particular social group, former gang members. Then there's a question of Nexus. So the immigration judge found that the entire family was being targeted for extortion. And petitioner himself in his statement said, the reason that the gangs were forcing me to pay rent to the new white family in the United States. So I mean, if I could find where it says in the record, where was it? His statement on remand. That was all I had written down. That's okay. Anyway, but he said that the motivation for the extortion was greed. So he knew that he had a source of income coming from the United States. Now, and with respect to the motive, I mean, he was attacked in prison, but he said in his asylum officer interview, he was attacked by the Maros. That's a rival gang. So he said the Maros, a rival gang, attacked him because he was an inactive member. That seems odd for a rival gang of MS-13 to be attacking him because he's not. But that's what he said in his asylum interview. So page 1145, if I'm recalling correctly. So first, I mean, the immigration judge didn't get to the motive, except to the extent the rent that the whole family was expected to pay the rent. But what I guess what I'm trying to get at is to the extent opposing counsel suggests that this court can grant relief, there's still a lot of issues to be resolved by the court of appeals. So while we still maintain that there are exhaustion issues, and that any errors here are harmless, I mean, we don't think the court should be in a position to grant relief. So do you want to say anything about the Convention Against Torture? There's very little discussion of that. I would like to, yeah, I wanted to point out to that too. The Convention Against Torture, with respect to the merits, he seems to contradict his own claim. The Convention Against Torture requires torture by a government official or with the acquiescence of the government official. He's claiming that the government actually thought he was a gang member. So the fact that the government is trying to combat the gang shows there's no acquiescence in any torture from the gang. So to the extent he's claimed he's being tortured by the government. I thought he's saying being tortured directly by the government, or at least at a substantial risk of that. He claims he was arrested and thrown in jail for no reason. He said pretty much the same thing with respect to the United States as well, his experience in the United States. So there's that. Finally, with respect to viewing the record cumulatively, I'm not sure how else you expect the agency to do it. You go through evidence one by one, and you discuss it, the merits, various merits, and then at the end, you view it cumulatively. That's exactly what the agency did here. It lists the various forms of corroborating the evidence and discussed it. I mean, in this case, unfavorably. At the end, viewing the record as a whole shows that they viewed the record cumulatively. I'm not sure how else the agency or court is supposed to do it. So, I mean, if you could have used that- It's just when they don't talk about something as important as Hanna's letter that you worry, would they have come to the same conclusion if we knew that they had really grappled with it? Well, I mean, with respect to the dates, again, at best, that was a typographical error. But, I mean, also the reference to the $7,500, which is ignored. I mean, they're important facts that they don't give us the benefit of their thinking on. Well, again, at most, it shows he was in jail for some reason. And again, with respect to a letter that was allegedly overlooked, maybe it was, I mean, the judge was a human, but he still ran into the same problem with the dates and length of incarceration. So if you send it back down, I think the immigration judge says it doesn't resolve the problem that Hanna said with the dates. So, I mean, I believe my time is up. Are there any more questions? Judge Rovner? Thank you for asking. That is really the first time anyone has done that. Thank you. Now, I wish I did. All right. Thank you very much. Thank you very much. Certainly. Anything further, Mr. Block? Thank you, Your Honor. There's two or three points I'd like to make during this rebuttal. And I want to start with the government giving short shrift the importance of Hanna's 2016 letter. It wasn't just that it corroborates that she was in jail. It corroborates that he was in jail. It corroborates that he was in jail twice. It also corroborates the fact she also states in her testimony that he was beaten in jail, punched in the face, and had a tooth knocked out and dislodged that caused a molar infection. So there's great significance, as you put it, to the building block of establishing first that he's in jail, which would at least force the agency to wrestle more with the fact about the testimony of what happened when he was in jail. So that's the first point I'd like Secondly, there was some discussion about the value of hearsay, and it's correct to point out that hearsay is permissible. But more than that, this court requires that an agency, when viewing hearsay, to see if there's indicia of reliability that makes the hearsay credible. In this case, the agency just said, this evidence is hearsay, and from the outset, we're going to give it little weight. The question that the agency needs to ask is, this is hearsay, but is it maybe true based on what else is in the record and what else is said? And the agency made a clear error when doing that. And third, while Francisco does believe that overlooking key evidence like the first time, again, requires remand, Francisco disagrees with the government that this court could not grant relief directly this time. There's a couple of factors that are important to consider. Could I just interrupt you there and say that, in the interest of being even-handed, Francisco did not do himself any favors with some of the things he was alleging earlier on when he was pro se. I think that the allegations he made that caused him to be found incredible go to his interactions with authority figures in the United States. He criticizes, implausibly, the agency found what judges found related to him. But that doesn't speak to the credibility of his story in El Salvador, which is the question that this court has to find. Moreover, Francisco is not asking for all of his testimony to be rehabilitated if they find the corroborating evidence credible. He's just asking for the parts that are corroborated to be considered. And those are significant parts. The government mentions that the MS-13 never harmed Francisco. They're ignoring the evidence in the record about the pistol whipping to the face that caused an injury bad enough to go to the hospital. That's a significant piece of evidence that runs contrary to that. Okay. So you need to wrap up. Oh, thank you, Your Honor. We believe that you should at least remand this case. All right. Thank you very much. Thanks to all counsel. We will take this case under advisement. And we appreciate your assistance to the court in accepting this appointment. Of course, we appreciate the government's participation as well. So as I said, the case will be taken under advisement.